2015-1642

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MACROSOLVE, INC.,

Plaintiff-Appellee,

v.

GOVERNMENT EMPLOYEES INS. CO.,

Defendant,

&

NEWEGG INC.,

Defendant-Appellant.

Appeal from the United States District Court for the Eastern District of Texas
in Case No. 6:11-cv-00287, Judge Michael H. Schneider

## NON-CONFIDENTIAL BRIEF OF APPELLANT NEWEGG INC.

Mark. A. Lemley
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666

Richard G. Frenkel
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 463-3080

Kent. E. Baldauf, Jr.
Daniel H. Brean
Bryan P. Clark
Christian D. Ehret
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815

*Counsel for Newegg Inc.*

June 26, 2015

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

MacroSolve v. Government Employees Ins., 2015-1642

## <u>CERTIFICATE OF INTEREST FOR NEWEGG INC.</u>

Counsel for Newegg Inc. hereby certifies the following:

1.    The full name of every party or amicus represented by me is:

      Newegg Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      No publicly held company owns ten percent or more stock in Newegg Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Kent E. Baldauf, Jr., The Webb Law Firm
      James J. Bosco, Jr., The Webb Law Firm
      Daniel H. Brean, The Webb Law Firm
      Anthony W. Brooks, The Webb Law Firm
      Bryan P. Clark, The Webb Law Firm
      Christian D. Ehret, The Webb Law Firm
      Herbert A Yarbrough, III, Yarbrough & Wilcox, PLLC
      Debra Elaine Gunter, Findlay Craft, PC
      Mark A. Lemley, Durie Tangri LLP
      Richard G. Frenkel, Latham & Watkins LLP

Dated:  June 26, 2015

      /s/ Daniel H. Brean
      Daniel H. Brean
      *Counsel for Newegg Inc.*

i

# TABLE OF CONTENTS

**CERTIFICATE OF INTEREST FOR NEWEGG INC.** ..................................... i

**TABLE OF CONTENTS** ....................................................................... ii

**TABLE OF AUTHORITIES** ................................................................. iv

**STATEMENT OF RELATED CASES** .................................................. viii

**JURISDICTIONAL STATEMENT** .........................................................1

**STATEMENT OF THE ISSUES** ............................................................1

**PRELIMINARY STATEMENT** .............................................................2

**STATEMENT OF THE CASE** ...............................................................5

I. PROCEDURAL HISTORY .............................................................5

II. FACTUAL BACKGROUND .............................................................9

  A. The '816 Patent ...............................................................9

  B. Newegg's Accused Mobile App and Conduct ....................11

  C. Newegg's Fee Motion ......................................................16

**SUMMARY OF THE ARGUMENT** ....................................................21

**STANDARD OF REVIEW** .................................................................25

**ARGUMENT** ....................................................................................26

I. THIS CASE IS EXCEPTIONAL AND EGREGIOUS, AND MACROSOLVE SHOULD PAY NEWEGG'S FEES .............................................................26

  A. MacroSolve's Infringement Case Had No Merit ................28

   1. *MacroSolve Could Not Have Proven Direct Infringement by Newegg* ............................................................................28

    a. Newegg's App Facially Lacked the Claimed "Questionnaire" Having a "Series of Questions" ....................................28

b.   MacroSolve's Testing and Joint Infringement Theories Were Futile ............................................................................32

2.   *MacroSolve Could Not Have Proven Indirect Infringement by Newegg*............................................................................*37*

a.   As MacroSolve Should Have Known All Along, There Is No Evidence that the Claimed Steps Were Ever Performed By Newegg's Customers ...................................................38

b.   As MacroSolve Should Have Known All Along, There Is No Evidence that Newegg Ever Induced Its Customers to Perform the Claimed Steps ......................................................45

c.   MacroSolve Conceded That There Was Never Any Contributory Infringement ................................................47

B.   MacroSolve Filed and Maintained this Lawsuit in Bad Faith ...........48

1.   *MacroSolve Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements* ...........................................*49*

2.   *Nuisance Litigation is Exceptional and Egregious* ........................*52*

3.   *Shifting Fees Against Nuisance Litigants Like MacroSolve Promotes Sound Policy and Improves the Patent System* ...............*57*

II.   AT A MINIMUM, THIS CASE MUST BE REMANDED BECAUSE THE DISTRICT COURT DID NOT CONSIDER THE TOTALITY OF THE CIRCUMSTANCES .......59

**CONCLUSION**..................................................................................................**63**

**ADDENDUM** ..................................................................................................**65**

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 3 and 49 reflects the terms of settlement agreements that were designed confidential by MacroSolve, and are subject to a protective order entered by the district court.

# TABLE OF AUTHORITIES

## *CASES*

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) ............................................................. 38, 39, 42

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) ...................................................................... 33, 34

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, No. 09-1372,
  2015 U.S. App. LEXIS 7856 (Fed. Cir. May 13, 2015) ............................... 14, 33

*Amsted Indus. v. Buckeye Steel Castings Co.*,
  23 F.3d 374 (Fed. Cir. 1994) .................................................................................57

*Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG,
  2000 U.S. Dist. LEXIS 1186 (D. Conn. Jan. 18, 2000).........................................53

*Biax Corp. v. Nvidia Corp.,* No. 2013-1649,
  2015 U.S. App. LEXIS 3082 (Fed. Cir. Feb. 24, 2015).......................................31

*BMC Res., Inc. v. Paymentech, L.P.*,
  498 F.3d 1373 (Fed. Cir. 2007) .................................................................... 14, 33

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,
  532 U.S. 598 (2001) ............................................................................................62

*Colombrito v. Kelly*,
  764 F.2d 122 (2d Cir. 1985)..................................................................................55

*Commil USA, LLC v. Cisco Systems*, No. 13-896,
  2015 U.S. LEXIS 3406 (May 26, 2015) ....................................................... 4, 58

*Cooter & Gell* v. *Hartmarx Corp.*,
  496 U.S. 384 (1990) ............................................................................................26

*Eon-Net LP v. Flagstar Bancorp,*
  653 F.3d 1314 (Fed. Cir. 2011) .................................................................... 52, 57

*E-Pass Technologies, Inc. v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007) ..................................................... 43, 44

*Ericsson, Inc. v. D-Link Sys.*,
    773 F.3d 1201, 1219 (Fed. Cir. 2014) ......................................... 38, 48

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
    721 F.3d 1330 (Fed. Cir. 2013) ...........................................................51

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010) ..........................................................39

*Gaymar Indus. v. Cincinnati Sub-Zero Prods., Inc.*,
    No. 2014-1174 (Fed. Cir. June 25, 2015)............................................31

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011) ........................................................................45

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
    134 S. Ct. 1744 (2014) ................................................................. *passim*

*Ingenuity 13, LLC v. Doe*, No. 2:12-cv-8333-ODW,
    2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013) ................................ 55, 56

*Kilopass Tech., Inc. v. Sidense Corp.*,
    738 F.3d 1302 (Fed. Cir. 2013) ................................................... *passim*

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    134 S. Ct. 2111 (2014) ................................................................ 33, 37

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ..........................................................46

*MarcTec, LLC v. Johnson & Johnson*,
    664 F.3d 907 (Fed. Cir. 2012) .................................................... 25, 56

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*,
    603 F.3d 943 (Fed. Cir. 2010) ...........................................................56

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012) ..................................... 38, 43, 45, 46

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*,
    726 F.3d 1359 (Fed. Cir. 2013) ...................................................................... 53, 55

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ............................................................. 13, 14, 33

*Nomos Corp. v. Brainlab USA, Inc.*,
    357 F.3d 1364 (Fed Cir. 2004) ......................................................................... 29

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) ............................................................................ *passim*

*Oplus Techs., Ltd. v. Vizio, Inc.*,
    782 F.3d 1371 (Fed. Cir. 2015) ..................................................................... 4, 58

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) .................................................................. 38, 48

*Primetime 24 Joint Venture v. NBC*,
    219 F.3d 92 (2d Cir. 2000) ............................................................................... 54

*SFA Systems v. 1-800-Flowers.com, Inc.*,
    No. 6:09-CV-340 (E.D. Tex.) ..................................................................... 19, 34

*SFA Systems v. Newegg Inc.*,
    No. 2014-1712 (Fed. Cir.) ................................................................................ 19

*Summit Data Sys. v. Emc Corp.*, No. 10-749-GMS,
    2014 U.S. Dist. LEXIS 138248 (D. Del. Sep. 25, 2014) ................................... 53

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
    57 F.3d 1054 (Fed. Cir. 1995) ............................................................................ 8

*Tandon Corp. v. ITC*,
    831 F.2d 1017 (Fed. Cir. 1987) ........................................................................ 28

*Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC,
    2009 U.S. Dist. LEXIS 4546 (W.D. Wis. Jan. 21, 2009) ................................... 54

*USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*,
    31 F.3d 800 (9th Cir. 1994) .............................................................................. 54

## *STATUTES*

28 U.S.C. § 1295(a)(1)......................................................................1

28 U.S.C. § 1331..............................................................................1

28 U.S.C. § 1338(a) .........................................................................1

28 U.S.C. § 2107(a) .........................................................................1

28 U.S.C. § 636(b) ...........................................................................1

35 U.S.C. § 271..............................................................................14

35 U.S.C. § 271(a) ..........................................................................14

35 U.S.C. § 271(c) ..................................................................... 16, 48

35 U.S.C. § 285 ....................................................................... *passim*

35 U.S.C. § 307(a) ..........................................................................51

## *RULES*

Federal Rule of Appellate Procedure 4 .................................................1

Federal Rule of Civil Procedure 72(a) .................................................1

## *OTHER AUTHORITIES*

Hannah Jiam, *Fee-Shifting and* Octane*:*
   *An Empirical Approach Toward Understanding "Exceptional*,"
   Berkeley Technology Law Journal,
   *available at* http://ssrn.com/abstract=2597195 (forthcoming 2015).....................5

## **STATEMENT OF RELATED CASES**

No other appeal from this civil action was previously before this Court or any other court of appeals.

*SFA Systems v. Newegg* (No. 2014-1712), currently pending before this Court, may affect or be affected by the Court's decision in the present appeal. The decisions of the district court in both *SFA* and the present appeal include reliance, in part, on the same analytical framework that Newegg challenges as erroneous in both appeals.

Newegg and its undersigned counsel are unaware of any other actions now pending in this or any other court that may directly affect or be directly affected by this Court's decision in the present appeal.

# JURISDICTIONAL STATEMENT

The district court had original jurisdiction under 28 U.S.C. §§ 1331, 1338(a).

The Magistrate Judge initially denied Newegg's motion for attorneys' fees. A0007-12. Newegg appealed to the District Judge and sought reconsideration pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(a). A3753-54. Newegg's motion was later denied by the District Judge. A0001-06.

Newegg timely appealed under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4. A0097. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

# STATEMENT OF THE ISSUES

1.    Whether the district court erred by failing to award attorneys' fees, expert fees, and other non-taxable expenses despite clear and unrebutted evidence showing that this lawsuit was meritless, and that it was filed and prosecuted to coerce a cost-of-defense settlement payment from Newegg.

2.    Whether the district court properly considered the totality of the circumstances, including the strength of MacroSolve's litigation positions, as required under *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), before finding this case not to be exceptional.

1

## **PRELIMINARY STATEMENT**

Unable to squeeze a settlement from Newegg after inflicting more than two years of litigation burden and expense, and shortly before a hearing on already-briefed summary judgment motions, MacroSolve suddenly decided that it would rather dismiss Newegg with prejudice than lose on the merits.

MacroSolve never genuinely believed that Newegg infringed its patent, nor could it. The '816 Patent is directed to an electronic questionnaire presenting a "series of questions" on a mobile device, yet MacroSolve could not identify a single question in Newegg's accused mobile app, let alone a series of questions, which by itself precludes any infringement.

The claims of the '816 Patent also require that the device presenting the questionnaire loses its network connection and then creates a new connection while the questionnaire is being completed—a method step that MacroSolve contends is met under the random and absurd situation where a user: (a) toggles its wireless connection off and back on in the middle of completing the alleged "questionnaire"; or (b) wanders outside of and back into the range of a wireless connection in the middle of completing the alleged "questionnaire." But there is no evidence of this ever happening or, even if somehow it did, that Newegg intended and encouraged such counter-productive actions by its customers.

2

CONFIDENTIAL MATERIAL OMITTED

The filing and prosecution of this action were solely intended to extort cost-of-defense settlement fees, not to resolve legitimate infringement claims. MacroSolve widely asserted its patent against mobile apps without regard to the merits of the infringement allegations, and proceeded to collect settlements bearing no demonstrable connection to the defendants' respective exposures.

According to MacroSolve, "[t]o date, MacroSolve has licensed the '816 patent to at least 63 companies and generated more than $4.6 million in revenue from its licensing program." A2412.  This averages to less than $75,000 per license.  Looking at the settlements individually, each settlement was for nuisance value, well below the cost of defense, and always as a round number.  A1593-94. Nearly every license was for [[          ]] or less, and almost half were for [[          ]] or less.  *Id.*

All the settling defendants made the economically expedient decision to pay MacroSolve a nuisance amount rather than incur considerably higher expenses to defend themselves.  And the vast majority of settlement fees were paid before any significant discovery was taken, some even before a scheduling order was entered. A3112.

In stark contrast to these nuisance payments is the fact that during damages discovery MacroSolve contended that a reasonable royalty for Newegg's alleged infringement would somehow be an amount between $350,000 and $32 *million*,

3

and that is only for a portion (October 2010 – September 2013) of Newegg's accused infringement.  A1550; A1717-18, at ¶¶ 155-56 & n.340; *see also* A1550 (calculating $13.2 million for GEICO).

Because Newegg would not pay MacroSolve off to settle even in the face of mounting legal expense and an excessive damages claim, when summary judgment was looming, MacroSolve cut and ran.  By the time Newegg filed its fee motion, MacroSolve's baseless and bad faith lawsuit forced Newegg to spend more than $650,000 in legal fees and expenses.

Defendants willing to contest meritless claims serve as critical checks against abuse of the patent system, which unfortunately has become quite prevalent.  The Supreme Court recognized this in *Octane Fitness* and issued a clear directive that fee shifting was supposed to be made easier to achieve, not harder. *See Oplus Techs., Ltd. v. Vizio, Inc.,* 782 F.3d 1371, 1374 (Fed. Cir. 2015) (*Octane Fitness* "lowers considerably the standard for awarding fees.").  To remove any doubt, the Supreme Court even more recently emphasized that § 285 is a "safeguard" against litigants that "use patents as a sword to go after defendants for money, even when their claims are frivolous," and "stress[ed] that district courts have the authority and *responsibility* to ensure frivolous cases are dissuaded" via § 285 and other available sanctions.  *Commil USA, LLC v. Cisco Systems*, No. 13-896, 2015 U.S. LEXIS 3406, at *22-23 (May 26, 2015) (emphasis added).

Unless fees are shifted in cases such as this one, the decision to incur substantial expenses to defend meritless cases, rather than pay a fraction to settle, becomes so unattractive that there will be even less resistance to this cynical but successful "business model." Despite the "considerably" lower standard, which has led to a more than two-fold increase in exceptional-case fee shifting nationwide, the Eastern District of Texas—an infamously favorite jurisdiction for abusive patent asserters to bring suit—has yet to grant a single § 285 motion post-*Octane Fitness*.[1]  The errors by the district court in this case, set against the backdrop of these statistics, confirm that clear guidance from this Court is vital to ensure that § 285 is applied correctly and consistently—in all district courts—to serve its intended "safeguard" purpose.

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

From March 2011 through September 2013, MacroSolve, Inc. ("MacroSolve") filed 67 lawsuits asserting its U.S. Patent No. 7,822,816 ("the '816 Patent") against nearly 100 distinct defendants, including various online retailers, banks, airlines, hotels, telecommunications companies, and social media

---

[1]  Hannah Jiam, *Fee-Shifting and* Octane*: An Empirical Approach Toward Understanding "Exceptional*,*"* __ Berkeley Tech. L.J. __ (forthcoming 2015), at 17, *available at* http://ssrn.com/abstract=2597195 (explaining that "[a]fter *Octane Fitness*, the proportion of fee awards granted under § 285 has more than doubled," and showing statistics of motions granted/denied by district).

companies.  The '816 Patent is generally directed to methods relating to electronic questionnaires in a networked environment.  For this patent assertion campaign, MacroSolve followed the all-too-familiar model of using the burden and expense of patent litigation as leverage to extort nuisance-value settlement fees from defendants regardless of the merits.

Newegg, an online retailer conducting business almost entirely via www.newegg.com, was sued in January 2012 among MacroSolve's scores of other targets.  A0001-02.  Newegg was accused of directly infringing the '816 Patent by testing the Newegg mobile app and by jointly performing the patented methods with Newegg's customers, and also of indirectly infringing by contributing to and actively inducing its customers' performance of steps on the mobile app.  A1001-02; A2149-50.

Newegg's case was consolidated with other defendants' cases in September 2012.  A0002, at n.1.  With the exception of Newegg and its co-defendant Government Employees Insurance Co. ("GEICO"), all other defendants settled well before the *Markman* briefing was underway.  *See generally* A0054-80 (docket sheet showing stipulated dismissals).

In April 2013, GEICO filed a petition for *ex parte* reexamination of the '816 Patent, which the USPTO promptly instituted.  A0076-77.  GEICO and Newegg

moved to stay the litigation pending the outcome of the reexamination. A0077. MacroSolve opposed, and the district court declined to stay the litigation. A0080.

On September 12, 2013, while the reexamination was pending, MacroSolve filed 11 new lawsuits in the Eastern District of Texas.[2]

Meanwhile, the Newegg and GEICO litigations proceeded through a *Markman* hearing held on September 26, 2013. A0081. The parties continued to engage in extensive fact and expert discovery. Shortly after receiving the claim construction order from the district court in January 2014, Newegg and GEICO moved for summary judgment of non-infringement. A0088; A2013-14.

While the summary judgment motion was pending, on March 7, 2014, the USPTO issued a final office action in the reexamination, rejecting all claims for obviousness over several prior art references. A0002; A3441-42.

On March 12, 2014, a month before the summary judgment hearing was scheduled, the parties engaged in a court-ordered mediation. A3102. The mediation resulted in GEICO being dismissed (A3094-95), but Newegg refused to settle because Newegg still believed the case was baseless and that Newegg would prevail on summary judgment.

Unable to secure any settlement fees from Newegg, MacroSolve instead filed a motion to dismiss its claims against Newegg with prejudice, and further

---

[2] The lawsuits were Civil Action Nos. 6:2013-cv-00665 though -00675.

covenanted not to sue Newegg in the future on the '816 Patent.   A3098-99.
MacroSolve had thus extinguished the case or controversy between the parties, and
Newegg was unable to oppose the dismissal of the case to maintain its declaratory
judgment counterclaims and have its non-infringement adjudicated by the court.
A3099 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054,
1059 (Fed. Cir. 1995)).

The day after dismissing Newegg, MacroSolve moved to dismiss the seven
remaining defendants of the 11 defendants MacroSolve had sued in September
2013. Those seven defendants were all dismissed without prejudice.  A3112.

As the prevailing party, Newegg sought and obtained its taxable costs in the
amount of $25,742.75.   A3769-70.   Newegg also filed a motion seeking its
attorneys' fees, expert witness fees, and non-taxable expenses.  A3106-07.  These
non-taxable sums totaled approximately $625,000 (of which roughly $480,000
were attorneys' fees and $117,000 were expert fees).  A3248, A3251-52.

While Newegg's motion was pending, the Supreme Court decided *Octane
Fitness*, which considerably relaxed the standard for "exceptional" cases under
§ 285.  Newegg filed a notice explaining the key holdings, and argued that "for the
same reasons expressed in [Newegg's fee motion], this case 'stands out from the
others' in a manner that warrants a finding of exceptionality and an award of fees."
A3714-15.

The Magistrate denied Newegg's motion, purportedly applying the standard of *Octane Fitness*. A0007-12. Newegg appealed to the District Judge and sought reconsideration. A3753-58. The District Judge denied Newegg's motion. A0001-06. This appeal followed.

## II.    FACTUAL BACKGROUND

### A.    The '816 Patent

The '816 Patent is directed to a method for transmitting a questionnaire from a server to a user so that the user can take the questionnaire on a remote computer, and so that the responses to the questionnaire can be made available on the Web. '816 Patent, at Abstract. Because "network connections between computers are not always available," the patent contemplates that data may be "stored at a node of the network and transmitted at the earliest time when a connection is available." *Id.* Terminating and establishing network connections are critical aspects of the patented method.

Claims 1-2, 4, 6-7, and 11-13, all of which are method claims, were asserted against Newegg. A2018-19. Claim 1 is representative:

1. A method for managing data including the steps of:
    (a) *creating a questionnaire comprising a series of questions*;
    (b) tokenizing said questionnaire; thereby producing a plurality of tokens representing said questionnaire;
    (c) establishing a first wireless modem or wireless LAN network connection with a remote computing device;

(d) transmitting said plurality of tokens to a remote computing device via said first wireless modem or wireless LAN network connection;

(e) *terminating said first wireless modem or wireless LAN network connection* with said remote computing device;

(f) after said first wireless modem or wireless LAN network connection is terminated, *executing at least a portion of said plurality of tokens representing said questionnaire* at said remote computing device to collect a response from a user;

(g) *establishing a second wireless modem or wireless LAN network connection* between said remote computing device and a server;

(h) after said second wireless modem or wireless LAN network connection is established, transmitting at least a portion of said response from the user to said server via said second wireless modem or wireless LAN network connection; and

(i) storing said transmitted response at said server.

The district court construed the term "questionnaire" as meaning "a program or form that includes a question or statement, which calls for a response." A1524. The term "questionnaire" thus includes both questions and certain statements. A1523. For example, fields having statements like "Name:" that request a response from the user (in this case, to type the user's name) are within the scope of the word "questionnaire." *Id.*

Although "questionnaire," standing alone, includes both questions and certain statements, all the asserted claims in the '816 Patent go further and expressly limit the questionnaire as comprising "a series of questions." '816 Patent, at Independent Claims 1, 11. By contrast, claim 8, which was not asserted against Newegg, does not require the questionnaire to include a "series of questions." Thus, the asserted claims substantially limit the scope of the

"questionnaire" to require a "series of questions" to be presented to the user.    It is for this reason that, during the *Markman* hearing, Newegg accepted the definition of "questionnaire" to include questions and certain statements—the issue of whether a "questionnaire" alone is limited to questions was explained to the district court as "somewhat moot in the sense that Claim 1 says creating a questionnaire comprising a series of questions, so there's already a series of questions."   A3291-93.

### B.    Newegg's Accused Mobile App and Conduct

Newegg offers a mobile app to its customers, on which customers can browse and purchase Newegg's many product offerings.  A2019-20.  According to MacroSolve, the following screen shot of Newegg's app, which permits a user to browse various categories of products, represents a "questionnaire" comprising a "series of questions":



A3209-11 (MacroSolve's expert report). This alleged "questionnaire" contains not a single "question," much less "a series of questions."

In opposing summary judgment on this issue, MacroSolve admitted the absence of a "series of questions," defending its position only by noting that the construction for "questionnaire" encompasses "statements" requesting information. *See* A2428-29 (arguing that "MacroSolve has pointed to a series of requests for information."). But this is beside the point and fails to address the separate, express "series of questions" claim language.

MacroSolve also admitted that Newegg does not itself perform every step of the claimed methods, and specifically accused Newegg's *customers* of performing at least two claim steps, but insisted that Newegg was nonetheless liable for direct

infringement of the entire method. A2149 (MacroSolve's expert contending that "Newegg also directly infringes the 816 patent through its customers' use of the Newegg mobile app, for example, when Newegg performs claim 1's steps (a), (b), and (d) and Newegg's customers perform the remainder of the steps"); *accord* A2326 (Newegg's expert confirming that infringement, if any, is divided). Specifically, under MacroSolve's theory, the steps of "terminating" the first connection and "establishing" the second connection are performed when users switch their phones into and out of airplane mode, or when users move out of and into the range of a wireless network. A2136-38. But it is beyond any reasonable debate that Newegg cannot, and does not, control or direct its customers to terminate and establish connections with their phones. A2074-75 ("Q. Do you know whether Newegg controls or directs its customers to perform steps other than A, B, and D? … Does Newegg, for example, instruct its customers to terminate a network connection? A. Not to my knowledge.").

Faced with the fact that Newegg and its customers are engaged in mere "'arms-length cooperation'" that cannot give rise to infringement liability by either party (*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008)), MacroSolve argued that liability could exist because Newegg and its customers were allegedly "acting in concert." A2429-30. While MacroSolve characterized its position as "the best view," it is not a view that is or was supported by law.

Joint tortfeasor theories of direct infringement such as "acting in concert" are simply not within the scope of § 271(a). *Muniauction*, 532 F.3d at 1329 ("[D]irect infringement requires a single party to perform every step of a claimed method.") (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380-81 (Fed. Cir. 2007)); *see also Akamai Techs., Inc. v. Limelight Networks, Inc.*, No. 09-1372, 2015 U.S. App. LEXIS 7856, at *25 (Fed. Cir. May 13, 2015) (reaffirming that "joint tortfeasor law and § 271 are fundamentally incompatible"). But even if the law did support an "acting in concert" theory, MacroSolve adduced no evidence to support it anyway. A2429-30.

Setting aside the technical and purely legal reasons that Newegg does not infringe, MacroSolve also had fatal evidentiary defects in its case. There was no evidence of *anybody*, other than MacroSolve's own expert, having ever used the Newegg mobile app to perform key steps of the accused methods. MacroSolve's expert could identify no evidence of anyone apart from himself actually performing at least the "terminating," "establishing a second … connection," and "transmitting at least a portion of said response" steps of the accused method. *See, e.g.,* A2070-71; A2022-23; A2163-64.

MacroSolve did not dispute that its expert failed to identify any specific customer of Newegg's who performed the patented methods on his or her mobile device, much less that that hypothetical individual did so at Newegg's direction.

14

MacroSolve instead tried to excuse its failure of proof by claiming that: (1) "[t]here is ample evidence that Geico and Newegg's mobile applications are in wide use by their customers;" and (2) "network connections and disconnections occur as a routine matter" when mobile apps are being used.  A2426.  Notably, MacroSolve's expert only ever tested Newegg's app by toggling airplane mode, and never verified whether the app could terminate and establish connections via his wandering-out-of-range or routine-network-disruption theories.  *E.g.,* A2137. Nonetheless, according to MacroSolve, "[t]his circumstantial evidence of direct infringement suffices" to carry MacroSolve's burden of proving that Newegg's customers performed the patented methods.  A2427.

MacroSolve also alleged that Newegg "encouraged [its] end-users to use their devices in ways that specifically infringe the patent-in-suit."  A2425, A2431. But the evidence on which MacroSolve relies for this proposition establishes, at most, that Newegg advertises and issues press releases for its mobile app, and generally encourages its customers to download and use the app.  A2813; A2810-11.  MacroSolve has no evidence of Newegg ever instructing its customers to perform the patented method steps, including, e.g., telling its customers to terminate their network connections while using the app.  A2074-75 (MacroSolve's expert's deposition) ("Q. Does Newegg, for example, instruct its customers to terminate a network connection?  A. Not to my knowledge.").

Finally, MacroSolve's expert also admitted that using the Newegg app without terminating and reconnecting to a network would constitute a substantial, noninfringing use. A2077-78. Even ignoring the fact that there was no direct infringer performing all the steps, MacroSolve could not establish that Newegg provided its mobile app with the requisite knowledge that the app was especially made or adapted to infringe, as required by 35 U.S.C. § 271(c).

None of the foregoing requires any significant discovery, complex technical analysis, or nuanced legal research to appreciate. A plain reading of the patent claims, a cursory examination of Newegg's app, and the most basic understanding of the law would be enough to see that Newegg could not possibly be liable to MacroSolve for infringement under any of MacroSolve's concocted theories. It was entirely unsurprising that, after two years of active litigation, MacroSolve was unable to obtain any evidence to support its theories.

C.    Newegg's Fee Motion

Newegg's fee motion began by explaining MacroSolve's pattern of vexatious litigation via its history of broad patent assertions and nuisance-value settlements. A3112. Newegg detailed the numerous fatal flaws in MacroSolve's infringement case. A3113-15, A3118-20. Newegg demonstrated how MacroSolve was litigating in bad faith, questioned whether MacroSolve had conducted an adequate pre-filing investigation, and showed that the abrupt dismissal of Newegg

16

confirmed MacroSolve's knowledge that its case would not survive summary judgment.  A3120-23.  Newegg also sought to recover its expert fees incurred rebutting MacroSolve's baseless case under the district court's inherent authority. A3123-24.

MacroSolve generally denied that its case was baseless, lacked evidentiary support, and was brought in bad faith.  Further, according to MacroSolve, "Newegg abandoned its argument that the claims require a user to cause the terminating and establishing steps" because Newegg had at one time sought a construction expressly stating as such, but ultimately agreed that "no construction is necessary to the extent that MacroSolve agrees that the connection must be unavailable." A3271-72.  MacroSolve also contended that Newegg's argument regarding the "series of questions" claim requirement was rejected when the district court construed "questionnaire" as including "statements" that call for a response.  A3274-76 (characterizing Newegg as "backtrack[ing]"). MacroSolve professed to have "acted reasonably" in prosecuting the case against Newegg, and demonized Newegg for having vigorously defended itself.  A3278-80.

Finally, MacroSolve argued that its dismissal of Newegg had nothing to do with the impending summary judgment hearing, but was motivated solely by its claims having been rejected in the reexamination.  A3280-81.  According to MacroSolve, it "did not have the resources to continue this multi-front war," and so

it made the decision to "focus its limited resources on its pending continuation application and decided not to continue to fight the reexamination." *Id.* In MacroSolve's view, it "did the right thing" by dismissing the case. *Id.*

Magistrate Judge Mitchell was the first to take up Newegg's motion. Judge Mitchell held that "[e]ven under the new, lower standard for an exceptional case designation, Newegg provides little evidence that this case 'stands out from others with respect to the substantive strength of [Macrosolve's] litigating position' or that it litigated the case in an unreasonable manner." A0010-11 (quoting *Octane Fitness*, 134 S. Ct. at 1756). As to Newegg's proof that MacroSolve's business model coerced nuisance-value settlements, Judge Mitchell noted "[t]hat Macrosolve asserted the '816 patent against a wide variety of defendants and settled many of those cases for significantly less than litigation costs does not alone show bad faith." A0011. Judge Mitchell did not find the timing of Newegg's dismissal suspect at all, holding that "the PTO's final office action that rejected all claims of the '816 patent just days before provides a reasonable explanation for the timing of the dismissal." A0011.

On the merits, Judge Mitchell disagreed that MacroSolve's case was baseless. First, Judge Mitchell declined to engage with Newegg's merits-related arguments, holding that "'[f]or a case dismissed before trial to be designated exceptional, evidence of the frivolity of the claims must be reasonably clear

without requiring a 'mini-trial' on the merits for attorneys' fees purposes.'" A0011 (quoting *SFA Systems v. 1-800-Flowers.com, Inc*., No. 6:09-CV-340, at 4–5 (E.D. Tex. filed July 8, 2014), *appeal pending* No. 2014-1712 (Fed. Cir.)).  Nonetheless, according to Judge Mitchell, Newegg's "shifting claim construction positions refute [Newegg's merits] arguments."  A0011.  Specifically, Judge Mitchell believed that "Newegg initially asserted that, under the '816 patent, a user must cause the network connection to become unavailable, but abandoned that position in its responsive claim construction brief," and now "again contends that steps must be taken by the user, out of its control, to infringe the patent."  A0011.  Judge Mitchell rejected Newegg's explanation that it "'was simply responding to infringement theories MacroSolve advanced'"—theories that suggested Newegg was, in fact, responsible for the performance of those steps.  A0011 (court expressing belief that this "does not explain Newegg's inconsistent positions or show that Macrosolve's theories were frivolous").  "Finally," Judge Mitchell held, "Newegg's mere assertion that it would not desire network connections to terminate while its mobile application is in use does not show that Macrosolve's indirect infringement theory was meritless."  A0011-12.  Thus, Judge Mitchell concluded that the case was not exceptional under § 285, nor was it sufficiently egregious to warrant expert fee shifting.  A0012.

Newegg submitted a motion for reconsideration and appealed to District Judge Schneider, arguing that Judge Mitchell failed to consider the totality of the circumstances. A3755. In addition to highlighting the short shrift Judge Mitchell gave to Newegg's evidence of bad faith litigation, Newegg contended that the district court, by failing to consider the merits in any detail, fell short of the consideration required by *Octane Fitness*. A3755-56 (arguing that the decision not to analyze the merits of the case beyond proof of "frivolity" simply because it was "dismissed before trial" "finds no support in *Octane Fitness*"). Newegg then emphasized the glaring defects in MacroSolve's infringement case, and explained why MacroSolve's argument about Newegg's "shifting claim construction positions" did not legitimize MacroSolve's claims. A3758.

Judge Schneider affirmed Judge Mitchell's decision and found the case unexceptional. Judge Schneider concluded that Judge Mitchell had performed an "explicit analysis" of the totality of the circumstances presented by Newegg, including Newegg's merits positions, and thus Judge Schneider made no further fact findings. A0004-05. Finally, Judge Schneider also agreed that Newegg's alleged "shifting claim construction positions" refuted Newegg's argument that MacroSolve's infringement claims were baseless. A0005 ("Newegg's claim construction positions are inconsistent with such arguments.").

20

## SUMMARY OF THE ARGUMENT

MacroSolve sued Newegg and scores of other targets for the improper purpose of seeking nuisance-value settlement payments. This patent lawsuit had nothing to do with any bona fide complaint of infringement, and Newegg should be reimbursed for its expenses contesting this meritless case.

While Newegg's co-defendants paid to settle, Newegg refused because MacroSolve was abusively accusing mobile app functions that did not infringe the patents-in-suit. For justice to be done, somebody had to challenge MacroSolve's baseless case and extortive patent litigation practices. Newegg accepted the task, and was weeks away from receiving a favorable summary judgment ruling when MacroSolve abruptly dismissed Newegg, without payment and with prejudice, rather than lose the case.

The baselessness of MacroSolve's case begins with the facially frivolous contention that a screen depicting a mere list of product categories is a "questionnaire" having a "series of questions." And MacroSolve's arguments never got any better from there. MacroSolve made wild accusations of infringing "testing" and "concert of action" for which not a shred of evidence or legal support existed, and MacroSolve knew it. MacroSolve professed that infringement was "inevitable" but could not identify a single instance where the claimed method was ever performed, much less performed by or at the direction of a single entity.

MacroSolve could not even come up with enough evidence to show that infringement could have plausibly ever occurred.

With its back to the wall, MacroSolve desperately pointed to Newegg having "instructed" its users to use the mobile app, and argued that this instruction induced infringement of the claimed method. But the claimed method requires absurd and seemingly random acts, such as "terminating" and then "establishing" one's mobile device's network connection in the middle of using the device to complete the claimed "questionnaire." The supposed "instructions" from Newegg were merely inviting users to use the app in general, not to terminate and establish network connections in the precise and context-specific manner of the claims. Indeed, it would make no sense for Newegg to instruct its customers to take such counter-productive measures that purposefully disrupt their ability to browse and purchase Newegg's products. MacroSolve's inducement theory was futile.

It is bad enough that Newegg had to defend against such baseless claims, lacking any factual and legal support. It is worse that MacroSolve pursued its case for more than *two years* before abruptly abandoning it in the face of an adverse judgment. Not only did this late-stage dismissal force Newegg to incur considerable legal fees and costs, but Newegg also had to retain separate rebuttal experts to defend against MacroSolve's bogus theories.

MacroSolve contends that it dismissed Newegg solely because its claims were rejected in reexamination and it lacked the resources to pursue Newegg and challenge the reexamination at the same time.  But this is just a convenient pretext.  If MacroSolve had any genuine belief that Newegg was infringing, or thought that this lawsuit had substantial value on the merits, it would (and could) have taken other courses of action short of permanently abandoning this lawsuit.  MacroSolve could have sought to dismiss Newegg *without* prejudice just as it did for several other defendants in light of the reexamination.  MacroSolve also could have sought to stay the litigation while it appealed the claim rejections to the Patent Trial and Appeal Board.  The notion that MacroSolve had no choice but to dismiss the case against Newegg with prejudice simply does not hold up.

More fundamentally, the fact that MacroSolve received an *invalidity* ruling from the USPTO has absolutely nothing to do with its decision to initiate and pursue frivolous *infringement* claims against Newegg for more than two years of protracted and expensive litigation.  Regardless of the timing and manner of the dismissal—which confirms MacroSolve's indifference to the merits—the case as a whole was baseless and exceptional.

Despite ample unrebutted evidence of the broad infringement assertions across entire industries, the nuisance amounts of the settlements, the early timing of the settlements, the baselessness of the infringement accusations, and

MacroSolve's unilateral dismissal after years of litigation in the face of an adverse summary judgment, the district court devoted only a single sentence to sweep nearly all of Newegg's evidence of bad faith aside: "That Macrosolve asserted the '816 patent against a wide variety of defendants and settled many of those cases for significantly less than litigation costs does not alone show bad faith."  A0011.

This gross oversimplification and dearth of analysis flies in the face of *Octane Fitness*'s directive to analyze the "totality of the circumstances."  Of course the mere number of lawsuits and settlement amounts does not "alone" demonstrate bad faith, and Newegg never argued as much.  But *Octane Fitness* requires consideration of such facts, in combination with other evidence tending to show that MacroSolve was, at best, indifferent to the merits, and in all likelihood was litigating despite the knowledge that it could not possibly prevail in proving infringement.  That kind of nuisance litigation is exceptional, and parties forced to defend against it should be able to recover the expense of vindicating their rights.

Companies that are willing to help weed out bad actors by challenging frivolous patent assertions should have realistic recourse for enduring such injustice and defending the integrity of the patent system.  Section 285 is a critical safeguard against the type of cynical, nuisance-value patent litigation that has given the patent system a bad name in some circles.  The business model of using meritless patent claims to extract nuisance payments from a broad cross-section of

businesses is, by design, normally kept out of this Court's view.   If fee shifting is denied in this type of case, the sharp practices on display here will stay in the shadows of confidential nuisance settlements.  Companies like Newegg will have that much less incentive to contest baseless claims.

Patent owners are required to litigate in good faith, and not to bring frivolous infringement claims.   Because MacroSolve failed on both accounts, this case "stands out from the others" and is exceptional under *Octane Fitness*, and is also sufficiently egregious to warrant expert fee shifting.  This Court should declare as much and order MacroSolve to pay Newegg's fees.

## STANDARD OF REVIEW

The denial of a motion for attorneys' fees is reviewed for abuse of discretion.  *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744, 1747 (2014) ("[A]n appellate court should review all aspects of a district court's § 285 determination for abuse of discretion.").  A district court's decision not to award expert fees is also reviewed for an abuse of discretion.  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"  *Highmark*, 134 S. Ct.

at 1748 n.2 (quoting *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

When a district court's fee determination is "premised on an incorrect legal standard," the decision must be vacated and remanded for consideration under the correct law. *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1310, 1317-18 (Fed. Cir. 2013) (vacating and remanding because district court's analysis was "incomplete" and "inappropriately narrow" by failing to "address[] the objective merits of [the plaintiff's] claims").

## ARGUMENT

### I.    THIS CASE IS EXCEPTIONAL AND EGREGIOUS, AND MACROSOLVE SHOULD PAY NEWEGG'S FEES

The district court should have recognized that MacroSolve's case was meritless from the outset, as confirmed by MacroSolve's inability to adduce any supporting evidence for its infringement theories after more than two years of active litigation. Rather than engage with the merits, the district court erroneously held that there was no need to do so because the case was "dismissed before trial." A0011. The district court then concluded that Newegg's merits arguments must be wrong because Newegg had allegedly presented "shifting claim construction positions" that were inconsistent with Newegg's arguments. A0011. But the district court clearly erred by finding that Newegg shifted or abandoned any of its merits arguments. Newegg's reasoning for why its accused app failed to meet the claims was entirely consistent, and correct, throughout the case.

26

Merely pointing to alleged inconsistencies from Newegg does not conform to the Supreme Court's directive that district courts must consider in all cases, including those dismissed before trial, "the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)." *Octane Fitness*, 134 S. Ct. at 1756. The district court abused its discretion by deeming the frivolity of MacroSolve's actual infringement arguments irrelevant in light of Newegg's perceived inconsistency. A0011 ("[Newegg's] assertion that it 'was simply responding to infringement theories MacroSolve advanced,' does not explain Newegg's inconsistent positions or show that MacroSolve's theories were frivolous."). Again, *Octane Fitness* required the district court to evaluate the merits even if Newegg was being inconsistent (which it was not, as explained below). Shining a light on the underlying merits issues is the only way to expose nuisance plaintiffs with meritless cases, especially where those plaintiffs unilaterally dismiss their cases prior to any final decision on the merits that could be reviewed (and, if erroneous, corrected) by this Court.

Looking at the totality of the circumstances, this case cannot be viewed as anything but exceptional and egregious. Newegg should have been awarded its attorney's fees, expert fees, and other non-taxable expense. The district court abused its discretion by finding otherwise.

A.    <u>MacroSolve's Infringement Case Had No Merit</u>

1.    *MacroSolve Could Not Have Proven Direct Infringement by Newegg*

a.    Newegg's App Facially Lacked the Claimed "Questionnaire" Having a "Series of Questions"

The asserted claims all require the step of "creating a questionnaire comprising a series of questions" that is later transmitted to a mobile device. '816 Patent, at Claims 1, 11. "Questionnaire" was construed by the district court to mean "a program or form that includes a *question or statement*, which calls for a response." A1524 (emphasis added). But the asserted claims further define the "questionnaire" as including a "series of questions." '816 Patent, at Claims 1, 11; A2018-19 (listing asserted claims). Thus, although the word "questionnaire," standing alone, includes certain statements and questions, the asserted claims expressly limit the questionnaire as having "a series of questions." Claim 8, by contrast, was not asserted and does not require the questionnaire to comprise a "series of questions." '816 Patent, at Claim 8. The scope of the asserted claims is plainly narrower and limited to questionnaires made of actual questions. *See Tandon Corp. v. ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

MacroSolve accused the following screen shot of Newegg's mobile app as a "questionnaire" comprising a "series of questions":



A3209-11.  The notion that this screen, which merely presents to a user a list of various categories of products, constitutes a "questionnaire" with even a single "question," much less "a series of questions," is absurd and frivolous.  Because this requirement of the claims is simply not met, MacroSolve could not possibly have proven infringement under any theory of direct or indirect infringement.  *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1367 n.1 (Fed Cir. 2004) ("[F]ailure to meet a single limitation is sufficient to negate infringement of the claim.").

Before the district court, MacroSolve conceded that the screen does not include a "series of questions," and defended its position by noting that the

construction for "questionnaire" encompasses "statements" requesting information. *See* A2428-29 (arguing only that "MacroSolve has pointed to a series of requests for information."). First, this argument from MacroSolve is entirely beside the point because it does not address the separate, express "series of questions" claim language that further restricts the claim to questions only. Second, the list of product categories that MacroSolve accused are a far cry from the kinds of "statements" that the district court had in mind that "call[] for a response," such as "a blank field with a label like 'Name:'". A1523-24.

The district court took up none of the foregoing analysis, and instead summarily dismissed Newegg's arguments by adopting wholesale MacroSolve's view that Newegg took inconsistent claim construction positions that the district court previously "rejected." *Compare* A0011 *with* A3274-76.

But any plain reading of the record shows that Newegg was consistent all along. At the *Markman* hearing, Newegg explained that it was willing to not press the issue of whether the term "questionnaire" *alone* required "question[s] with a question mark" because the asserted claims separately require a "series of questions":

> Mr. Clark: Well, I think that *that particular point may be somewhat moot in the sense that Claim 1 says creating a questionnaire comprising a series of questions, so there's already a series of questions*. So I think we would be willing to accept instead -- where in our definition it says 'that includes questions,' I think we would accept questions or statements requesting information.

A3291-93.    Because the district court only construed "questionnaire" and never commented on Newegg's reasoning regarding the additional "series of questions" claim language, at no point did the court "reject" Newegg's position that the claims required actual questions.    This clear factual error, which formed a large portion of the basis for denying Newegg's motion, constitutes an abuse of discretion that requires reversal.  *Highmark*, 134 S. Ct. at 1748 n.2; *see also Biax Corp. v. Nvidia Corp.,* No. 2013-1649, 2015 U.S. App. LEXIS 3082, at *10 (Fed. Cir. Feb. 24, 2015) (reversing § 285 decision because "the district court misread the expert's testimony" and misunderstood the party's positions); *Gaymar Indus. v. Cincinnati Sub-Zero Prods., Inc.*, No. 2014-1174, slip op. at 15-16 (Fed. Cir. June 25, 2015) (reversing and remanding § 285 decision based on district court's erroneous finding of inconsistencies and misrepresentations by defendant).

There is simply no way that Newegg's app's listing of product categories constitutes a "questionnaire" made up of a "series of questions."    This fact is readily apparent upon a cursory comparison between the '816 Patent and the Newegg app, and should have been sufficient to deter MacroSolve, had it performed any meaningful pre-filing investigation, from bringing this lawsuit, let alone prosecuting the lawsuit all the way through expert discovery.    It was an abuse of discretion for the district court not to recognize the frivolity of MacroSolve's positions.

b.    MacroSolve's Testing and Joint Infringement Theories Were Futile

MacroSolve's other half-hearted efforts to establish direct infringement by Newegg are equally defective and frivolous. First, MacroSolve suggested that Newegg's internal testing of the app involved performance of the patented method. A2424-25. This was not a serious contention developed in the district court, however, as it would be nonsensical for Newegg to have tested its app to perform the highly context-specific and absurd network terminating and establishing steps, as detailed *infra*. Thus, unsurprisingly, MacroSolve's expert made only a passing mention of any testing theory, did not conduct an element-by-element analysis, and the evidence in the record of Newegg's testing says nothing whatsoever about, for example, the terminating and establishing steps in the claims. A2149 (citing, e.g., A2437-47).

Second, MacroSolve attempted to do an end-run around this Court's precedent by accusing Newegg of directly infringing by "acting in concert" with Newegg's customers to perform all the steps of the method. A2429-30. Under MacroSolve's theory, Newegg is responsible for when its customers perform the steps of "terminating" the first connection and "establishing" the second connection by switching their phones into and out of airplane mode, or by moving out of and into the range of a wireless network. A2136-38. But the evidence is unrebutted that Newegg cannot, and does not, control or direct its customers to

32

terminate and establish connections with their phones. *See* A2074-75 (MacroSolve's expert's deposition) ("Q. Do you know whether Newegg controls or directs its customers to perform steps other than A, B, and D? … Does Newegg, for example, instruct its customers to terminate a network connection?  A. Not to my knowledge.").

The law was settled long before this lawsuit that Newegg's and its customers' behavior amounts to mere "arms-length cooperation" that cannot give rise to direct infringement liability by either party. *Muniauction*, 532 F.3d at 1329. MacroSolve's last-minute "acting in concert" theory has never been supported by the law of this Court.  This Court has consistently required a single actor to either: (1) itself perform all claim steps; or (2) control or direct a second actor to perform claim steps such that the first actor is vicariously liable for the second actor's actions. *Id.*; *BMC,* 498 F.3d at 1380; *Akamai,* 2015 U.S. App. LEXIS 7856, at *25. And even if the law did support an "acting in concert" theory, MacroSolve adduced no facts or evidence to support such a theory.  A2429-30.

Although the law temporarily allowed for inducement liability to attach despite the absence of a single-entity direct infringer, *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308-09 (Fed. Cir. 2012) (en banc), *rev'd, Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014), MacroSolve never developed any corresponding theory or evidence to support

such an inducement claim. Instead, MacroSolve misapprehended the meaning of the now-reversed *Akamai* (en banc) decision in attempt to excuse its failure of proof. A2430. While MacroSolve contended that "[i]t is enough that defendants perform some steps, and that their customers perform the remainder," *id.*, even under *Akamai* (en banc) it is absolutely not "enough" to establish any inducement liability on Newegg's part without meeting the requirements for proving active inducement, which this Court did not purport to modify or set aside. *See Akamai*, 692 F.3d at 1308 (noting that the accused inducer must actively encourage the infringing conduct, and that the conduct must actually be carried out). As explained *infra*, MacroSolve could never have proven that Newegg actively induced its customers to perform the accused steps for a variety of reasons. This Court's en banc *Akamai* decision is no safe harbor for MacroSolve.

The district court professed that there was no need to seriously analyze these merits issues because the case was "dismissed before trial." A0011 (citing *SFA Systems*, No. 6:09-CV-340, at 4–5). At most, the district court merely pointed to believed "shifting claim construction positions" by Newegg to conclude that Newegg's arguments on the merits were wrong. A0011. But the record once more belies the district court's belief.

Newegg originally sought to construe the "terminating" step as requiring action by the end user of the app, and later withdrew its request that the district

court expressly issue such a construction.  In doing so, however, Newegg never suggested that the claims somehow excluded end-user actions, as the district court implied.  Rather, Newegg summarized its position as follows:

> While Defendants maintain that the most natural reading of the limitation in view of the specification is that the connection is terminated by the user, in an effort to simplify the issues before the Court, Defendants agree to MacroSolve's position that no construction is necessary to the extent that MacroSolve agrees that the connection must be unavailable.

A1283.  To streamline the process, Newegg did not press for a construction that "the user must" cause the termination, and conceded that the termination could conceivably be caused by some other actor.  *Id.*  What mattered most was that the action taken must cause the connection to become "unavailable."

MacroSolve's infringement allegations further mooted the claim construction issue of precisely which actors must make the connection unavailable. MacroSolve expressly accused Newegg's customers of performing the terminating and establishing steps by toggling their phones into and out of airplane mode, or by entering or leaving the range of a wireless network.  A2136-37.  MacroSolve likewise suggested that "gaps in cellular phone networks … illustrate[] that a handheld device may not always be connected to the network," and contended that such "routine" network connections and disconnections necessarily caused the terminating and establishing steps to be performed.  A2137; A3272.

Whether by its customers or by the alleged inherent network connectivity disruptions, Newegg correctly responded that the "terminating" and "establishing" claim steps were absolutely *not* performed by Newegg or at Newegg's direction. As Newegg maintained all along, the claimed actions must make the connection unavailable, and either way the action was performed by a third party outside of Newegg's control. No evidence exists that Newegg is in any way responsible for its customers' decisions to toggle airplane mode or wander outside of a wireless network's range, or that Newegg—an online retailer, not a telecommunications company—in any way controls or directs the alleged routine disruptions that occur in cellular phone networks.

Again, the district court ignored these glaring legal and factual defects of MacroSolve's divided infringement theories, and did not even make an effort to analyze the merits of the theories at all. *See* A0010-12. Had the district court undertaken this analysis, it could not have reached any conclusion other than to find MacroSolve's positions frivolous.

Newegg should not be required to bear the expense of having to respond to such frivolous positions and retain an expert to do so, and the district court erred by ruling to the contrary. There was also no inconsistency or "shifting" position by Newegg, and the district court's finding to the contrary, which formed a substantial

basis for denying Newegg's motion, was an abuse of discretion requiring reversal. *Highmark*, 134 S. Ct. at 1748 n.2.

> 2. *MacroSolve Could Not Have Proven Indirect Infringement by Newegg*

Any liability for indirect infringement requires a threshold showing of underlying infringement. *Limelight Networks*, 134 S. Ct. at 2117. Because, as demonstrated above, MacroSolve could not possibly have proven such underlying infringement by Newegg, no liability for indirect infringement on those grounds can exist either.

However, MacroSolve separately posited that Newegg's customers were infringing with Newegg, and that Newegg was liable for actively inducing and contributing to that infringement. A1002. But such a theory was hopeless from the outset given the extremely precise context of the claim steps relating to at least the "terminating" and "establishing" steps. And after more than two years of extensive fact and expert discovery it came as no surprise that MacroSolve had developed no evidence to show that even a single one of Newegg's customers ever performed the accused steps of the patented methods.

MacroSolve fell back on this Court's precedent allowing for "circumstantial" proof, but failed there as well because it had no evidence that Newegg ever encouraged performance of the claimed steps, rather than the general use of the app. Again, it was hopeless for MacroSolve to think it ever could have

found such specific instructions from Newegg because instructions, e.g., to terminate one's connection to Newegg's servers is counterproductive and frustrates the purpose of using the app in the first place—to connect to Newegg's servers for browsing and purchasing purposes.

Finally, MacroSolve conceded that, as it must have known all along, the Newegg app has substantial non-infringing uses when there are no terminated connections, precluding any finding of liability for contributory infringement.

        a.      As MacroSolve Should Have Known All Along, There Is No Evidence that the Claimed Steps Were Ever Performed By Newegg's Customers

It is well settled that "[a] method claim is directly infringed when someone practices every step of the patented method." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1219, 1221 (Fed. Cir. 2014) ("[T]he direct infringer must *actually* perform the steps"). It is also well settled that "[m]ethod claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). A patentee must provide "evidence of specific instances of direct infringement." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313–14 (Fed. Cir. 2007); *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1361–62 (Fed. Cir. 2012) ("[C]apability, not actual use" of the claimed method is

insufficient to support a finding of indirect infringement where the claimed methods "require additional user action beyond just turning on the tools.").

"[E]xpert testimony and instructions for the product that showed it could operate in an infringing manner" do not provide the requisite evidence of direct infringement. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327–30 (Fed. Cir. 2010). Nor is it enough that a plaintiff's expert performed the accused method. *ACCO*, 501 F.3d at 1313 (expert was "not aware of anyone else using the [product] in the [infringing mode]"). "Hypothetical instances of direct infringement are insufficient to establish vicarious liability or indirect infringement." *Id.* at 1313.

It is important to recognize just how absurd and unlikely it is that MacroSolve's patented methods steps would ever have been performed by anybody using Newegg's mobile app. First, if the steps of "terminating" and "establishing" connections were performed by Newegg's customers as MacroSolve accused, those steps would only be performed under the random and nonsensical situation where a user either: (a) toggles the wireless connection off and back on in the middle of completing the alleged "questionnaire"; or (b) wanders outside of and then back into the range of a wireless connection in the middle of completing the alleged "questionnaire." Neither of these odd situations is likely to, let alone necessarily going to, occur during use of the Newegg app. Newegg's app, which allows customers to browse and purchase its product selections, is designed and

intended to work *with* a network connection, not without one, so neither Newegg's customers nor Newegg would want such steps to occur at any time.

Beyond that, the timing and context of those steps is very precisely recited in the claims. To constitute infringement, at least: (1) the terminating step must occur on the "said first wireless … connection" that was used to transmit the "plurality of tokens representing said questionnaire" referenced throughout the claim; and (2) the "establishing a second wireless … connection" step must occur such that "a portion of said response" to the questionnaire is transmitted "via said second wireless … connection." '816 Patent, Claim 1. Further, under the district court's construction, "terminating" occurs after "transmitting" the tokenized questionnaire but before "executing" a portion of the tokens. A1537, A1540. The odds of this ever happening via Newegg's app is effectively zero and MacroSolve should have known it.

For instance, MacroSolve's expert pointed to a user of the Newegg app typing into a form to change his or her shipping address as satisfying the "executing at least a portion of tokens representing said questionnaire" step after the connection is terminated. A2137.[3] That a user would, in the middle of

---

[3] The "questionnaire" MacroSolve identified for the "executing" step (i.e., the change-of-address form) is different from the list-of-product-categories "questionnaire" MacroSolve accused, as discussed above. A2133-35, A2137. Because the claims expressly recite only a single "questionnaire," this discrepancy

updating his or her address, toggle the phone into airplane mode or walk into a basement and out of range of a wireless network, is illogical and highly doubtful. *Id.*

Indeed, after more than two years of discovery, MacroSolve's expert could identify no evidence of anyone apart from himself actually performing at least the "terminating," "establishing a second … connection," and "transmitting at least a portion of said response" steps of the accused method in the context of the method as a whole. *See, e.g.,* A2070-71; A2022-23; A2163-64. Even then, MacroSolve's expert only ever performed the method by toggling the phone into airplane mode— he never tested whether the network terminations could ever occur in the correct timing and context merely by walking out of range of the network, or via the alleged inherent network disruptions. *See, e.g.,* A2137.

MacroSolve tried to excuse its failure of proof by arguing that: (1) "[t]here is ample evidence that Geico and Newegg's mobile applications are in wide use by their customers;" and (2) "network connections and disconnections occur as a routine matter" when mobile apps are being used. A2426. According to MacroSolve, "[t]his circumstantial evidence of direct infringement suffices" to carry MacroSolve's burden. A2427.

---

reflects one of many irreconcilable inconsistencies in MacroSolve's infringement case.

41

But MacroSolve's expert only went as far as to say that infringement *potentially might* occur—not that it actually or necessarily occurred. *See, e.g.,* A2136 ("it is possible" that a user could submit a response while the network is down); A2138-39 (the device "may" establish a second connection and the app "can" communicate responses). This falls far short of establishing "specific instances of direct infringement or that the accused device necessarily infringes the patent in suit," as the law requires. *ACCO*, 501 F.3d at 1313. And, as discussed below, MacroSolve's expert conceded that the apps can be operated in a non-infringing manner at any time, thus precluding outright the notion that any infringement necessarily occurred. A2077-78.

MacroSolve's suggestion that cellular data networks routinely connect and disconnect (A2137) does not mean that such events necessarily occurred at the time and in the context recited in the claims either. After years of litigation, MacroSolve identified no evidence to show whether (let alone how often) such alleged network disruptions happen during use of the Newegg app, and precisely when those events occur relative to the several additional method steps in the claims. The claims require far more than merely proving that disconnections and connections *might* occur while the app is in use, which is the most that MacroSolve's theory ever purported to establish. *See supra*.

Undeterred, MacroSolve contended that "infringement of [its] patent will inevitably result because of the nature of the networks [Newegg] employ[s]." A2432. This bare proclamation that infringement was "inevitable" is very similar to a position this Court previously rejected:

> If … it is "unfathomable" that no user in possession of one of the accused devices and its manual has practiced the accused method, … [the patentee] should have had no difficulty in meeting its burden of proof and in introducing testimony of even one such user.

*E-Pass Technologies, Inc. v. 3Com Corp.* 473 F.3d 1213, 1222-23 (Fed. Cir. 2007) (affirming summary judgment of noninfringement). Like the patentee in *E-Pass*, if infringement was as certain as MacroSolve alleged, it should have been able to produce evidence of actual infringement. Again, MacroSolve's expert did not even bother to test his wandering-out-of-range or inherent-network-disruption-theories. Infringement, if any, is very far from "inevitabl[e]."

MacroSolve cannot shortcut its infringement burden by ignoring the majority of the steps and merely suggesting that network disruption generally occurs in the abstract. *Mirror Worlds*, 692 F.3d at 1361 ("[O]ne cannot selectively piece together disparate parts of an article to show an underlying act of infringement of a method claim. A method claim is only infringed if all of its parts are performed."). MacroSolve had no evidence (and could not have reasonably expected to find any), circumstantial or otherwise, that ties all the steps of the claims together.

Finally, MacroSolve contended that Newegg's app was "specifically designed so that a user's experience is not impacted when such connections and disconnections occur." A2426. MacroSolve alleged that "Newegg's product is designed to continue to collect responses from the user despite network connections going down." A3273. According to MacroSolve, "given the incredibly wide-spread use of Newegg's mobile application, it is a certainty that MacroSolve's patent has been infringed." A3273. But, like MacroSolve's argument regarding routine network disconnections, this position also lacks evidentiary support[4] and, even if true, fails to establish that one or more users actually or necessarily performed *all* the method steps in the order and manner recited. Merely expressing the belief that infringement "is a certainty" does not make it so. *E-Pass*, 473 F.3d at 1222-23.

The district court erred by side-stepping all of the foregoing analysis. A0011-12 (stating only that "Newegg's mere assertion that it would not desire network connections to terminate its mobile application is in use does not show that MacroSolve's indirect infringement theory was meritless"—an assertion addressed separately below). Had the district court addressed the substance of MacroSolve's failure of proof, it could not have concluded that MacroSolve's

---

[4] *See* A3273 (citing A2512) (testimony of Newegg witness stating only that the app does not "behave any differently" after a user's connection switches from wifi to cellular connections)).

positions had merit without multiple clear errors of fact and law.  The judgment should be reversed on that basis.

> **b.**    As MacroSolve Should Have Known All Along, There Is No Evidence that Newegg Ever Induced Its Customers to Perform the Claimed Steps

Beyond having insufficient evidence that infringement occurred, MacroSolve also erroneously argued that Newegg induced infringement by "encourage[ing] [its] end-users to use their devices in ways that specifically infringe the patent-in-suit."    A2425, A2431.    But the evidence on which MacroSolve relied for this proposition established, at most, that Newegg advertises and issues press releases for its mobile app, and generally encourages its customers to download and use the app.  A2813; A2810-11.  MacroSolve has no evidence of Newegg ever instructing its customers to perform the patented method steps, including, e.g., telling its customers to terminate their network connections while using the app.  A2074-75 ("Q. Does Newegg, for example, instruct its customers to terminate a network connection?  A. Not to my knowledge.").

Newegg would essentially have had to "directly instruct a user how to infringe," knowing of the patent and of MacroSolve's curious interpretation of that patent, in order for MacroSolve to carry its burden.  *Mirror Worlds*, 692 F.3d at 1360; *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).  Even if, in addition to generally encouraging use of the app, Newegg had

separately told its users how to toggle their phones into and out of airplane mode (of which there is no evidence), that still would not be enough because "such [instructions] do[] not show that all of the steps were performed together." *Mirror Worlds*, 692 F.3d at 1360-61; *see also supra* (discussing the precise timing and context of the "terminating" and "establishing" steps). In cases where the record included specific instructions for how to use the product in an infringing way, this Court has deemed that evidence (on top of other extensive sales and other testimony) "just barely sufficient to permit the jury to find direct infringement." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009). MacroSolve is far short of that threshold in this case.

Common sense confirms why Newegg did not instruct its customers—or anybody else, for that matter—to terminate their network connections. Newegg's app relies on the user being connected to its servers to fully function and allow the users to browse and purchase Newegg's products. There is no reason that Newegg would desire its customers to lose their connections to Newegg's servers, as it is entirely counter-productive of Newegg's mission to show and sell products to its customers. To claim that Newegg instructed its users to terminate their network connections during use of the app (and think that evidence of this would exist) is frivolous.

The district court's entire response to the defects in MacroSolve's inducement theory was the single statement: "Newegg's mere assertion that it would not desire network connections to terminate while its mobile application is in use does not show that Macrosolve's indirect infringement theory was meritless." A0011-12. This statement fails to address MacroSolve's inability to: (1) provide evidence of actual instances of direct infringement; (2) provide evidence that infringement necessarily occurred; (3) identify any legally relevant instructions from Newegg tending to induce infringement; and (4) demonstrate that Newegg both knew of the patent and intended to cause infringement under MacroSolve's absurd theory, which together are decisively dispositive. Newegg could not possibly have been liable for active inducement on this record, and the district court's judgment to the contrary was an abuse of discretion.

> c.    MacroSolve Conceded That There Was Never Any Contributory Infringement

Finally, although MacroSolve claimed to also accuse Newegg of contributory infringement, MacroSolve's expert admitted that using the Newegg mobile app without terminating and reconnecting to a network would constitute a substantial, noninfringing use of the mobile app:

> Q. And if you were to [use the app without terminating the network connection] would that use infringe the claim, any claim?
> …

47

> A. You'd not be -- you'd not be experiencing a disconnection but you would be using the system that had the capability of operating under a disconnect.
>
> …
>
> Q. Would you consider that a substantial use of the Newegg app to use it without experiencing the disconnection?
>
> …
>
> A. Yes.

A2077-78.  As common sense should have dictated to MacroSolve all along, using an app without network disconnections is a substantial use of the app.  And because the mere "capability" of infringement is not tantamount to infringement of a method claim, that substantial use was admittedly non-infringing.  *Ericsson*, 773 F.3d at 1219, 1221; *Ormco*, 463 F.3d at 1311.

Given these critical concessions, MacroSolve could not possibly establish that Newegg provided its mobile app with the requisite knowledge that the app was especially made or adapted for use in an infringement, and not a staple article suitable for substantial noninfringing use, as required by 35 U.S.C. § 271(c).  It was baseless to suggest that Newegg could "knowing[ly]" infringe under these circumstances.  *Id.*

## B.    MacroSolve Filed and Maintained this Lawsuit in Bad Faith

The model for MacroSolve's campaign was to file lawsuits and settle quickly for nuisance value to avoid ever having to test the merits of its cases in court.  When faced with a determined defendant set on vindicating its defenses,

CONFIDENTIAL MATERIAL OMITTED

after pressing on for two years, MacroSolve cut and ran in the face of an impending adverse summary judgment.

1.    *MacroSolve Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements*

According to MacroSolve, "[t]o date, MacroSolve has licensed the '816 patent to at least 63 companies and generated more than $4.6 million in revenue from its licensing program." A2412.  This averages to less than $75,000 per license.  Every settlement license was for nuisance value, well below the cost of defense, and always as a round number. A1593-94.  Nearly every license was for [[          ]] or less, and almost half were for [[          ]] or less. A1593-94.  The vast majority of settlement fees were paid before any significant discovery was taken, and some even before a scheduling order was entered.  A3112.  The amounts of the settlements also have a significantly downward trend over time, with some of the most recent settlements totaling only [[          ]].  A1593-94.

MacroSolve is unable to show that the sums paid by the various defendants were tied to those defendants' exposures in the litigation.  The sums reflect nuisance value and nothing else.  Although MacroSolve professed that its case was worth orders of magnitude more, A1717-18, at ¶¶ 155-56 & n.340 (positing that a reasonable royalty could exceed $32 million), the fact that MacroSolve accepted such comparatively small sums reveals that its damages positions were no more than a scare tactic to present large dollar figures to coerce settlement.

MacroSolve's motives are further confirmed by the lack of any legitimate, non-frivolous infringement contentions throughout the entire litigation (*see supra*), and by its jettisoning the case against Newegg before an imminent and unavoidable adverse summary judgment determination.

MacroSolve professed that it dismissed Newegg because its claims were rejected in the reexamination, and because MacroSolve lacked the financial resources to litigate on all fronts, but the record shows otherwise. Indeed, MacroSolve chose to file eleven new lawsuits in September 2013—well after the reexamination was instituted. Initiating eleven new lawsuits is not the kind of action taken by a litigant having severe financial constraints. On the other hand, such conduct is entirely consistent with a litigant bringing lawsuits under the expectation that those suits will all settle quickly for nuisance value, and thus will not require any substantial financial investment by the plaintiff.

At best, MacroSolve's contention of limited financial resources was just a pretext to try to avoid fees and divert attention away from its misconduct prior to the dismissal. If MacroSolve, despite having collected more than $4.6 million over scores of nuisance settlements, truly lacked the resources to pursue both the USPTO and district court proceedings, and if MacroSolve believed that an adverse reexamination determination would not be worth appealing (A3280-81), the only reason for it to have *opposed* earlier efforts to stay the litigation pending the

reexamination (A0077) would be to continue to apply coercive nuisance settlement pressure and collect money while it still could.

And if MacroSolve had a good faith belief that its infringement case had merit (and was worth a lot of money), it had several other options short of completely abandoning the case. For example, it could have sought a stay of the litigation pending the final outcome of an appeal of the reexamination. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1339-40 (Fed. Cir. 2013) (explaining that claim cancellation at the conclusion of a reexamination moots co-pending litigation); 35 U.S.C. § 307(a) (providing that appeals from reexamination proceedings defer USPTO's cancellation of claims). It also could have moved to dismiss Newegg *without* prejudice in light of the claim rejections, just as it did with several other defendants immediately after Newegg was dismissed. A3112. If this case was worth pursuing for two years, to the brink of summary judgment and with the sincere hope of recovering a considerable reasonable royalty sum, then it would have been worth keeping the case alive somehow instead of outright abandoning it at a time convenient to try to avoid fee shifting.

More fundamentally, the fact that the *invalidity* determination at the USPTO was unfavorable does not begin to excuse MacroSolve from pursuing frivolous *infringement* claims for two years. This renders the case exceptional regardless of the manner or timing of the dismissal. But to press on with an un-winnable case in

the hope of receiving nuisance payments only to abandon both the lawsuit and the patent when it becomes clear that no such payments are forthcoming shows that MacroSolve never cared about the merits.

Finally, while Newegg's evidence of bad faith is admittedly circumstantial, that is typical and expected of any litigant in Newegg's position because, as this Court has recognized, "[s]ubjective bad faith is difficult to prove directly." *Kilopass*, 738 F.3d at 1311 (explaining that "[l]ack of *direct* proof of subjective bad faith" does not preclude fee shifting). If MacroSolve lacked bad faith, this Court has noted that it is "easy to provide" such countervailing evidence. *Id.* at 1311, 1308 (plaintiff produced evidence of "substantial pre-filing investigation" and opinions from two law firms indicating that case was not baseless). But MacroSolve came forward with nothing showing good faith in its infringement assertions at all. For the district court to credit MacroSolve's unsupported denials over Newegg's evidence proving bad faith was an abuse of discretion.

### 2.    *Nuisance Litigation is Exceptional and Egregious*

As this Court has observed, "low settlement offers … effectively ensure[] that [the patentee's] baseless infringement allegations remained unexposed, allowing [the patentee] to continue to collect additional nuisance value settlements." *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1327 (Fed. Cir. 2011). Fees have been awarded where, like here, a plaintiff filed suit "without any basis for infringement"

and strung the case along while it "extracted settlements from co-defendants worth a fraction of what it would actually cost them to defend the lawsuit, and then voluntarily dismissed its claims with prejudice prior to the court issuing a ruling on the merits." *Summit Data Sys. v. Emc Corp.*, No. 10-749-GMS, 2014 U.S. Dist. LEXIS 138248, at *8-14 (D. Del. Sep. 25, 2014); *see also Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186, at *10-11 (D. Conn. Jan. 18, 2000) (explaining that the filing of many lawsuits seeking relatively small settlements "give[s] rise to a suspicion of barratry and champerty").

An "overall vexatious litigation strategy" that is wasteful of judicial resources can also support an exceptional case finding, and belated timing of a dismissal can reveal bad faith and justify fee shifting. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013). In *Monolithic Power Systems*, the case was deemed exceptional largely because the plaintiff "withdrew its claims and granted covenants not to sue after substantial litigation had taken place," "moving to dismiss only after [defendants] had completed their filings for the final pretrial conference, wasting the parties' and the court's resources." *Id.* Here, MacroSolve waited two years to dismiss Newegg when Newegg's lack of liability should have been apparent all along, and did not actually dismiss until after Newegg had endured the burden and expense of expert discovery and summary judgment briefing. And MacroSolve's motion to dismiss Newegg was only a month before

the summary judgment hearing was scheduled. MacroSolve should not be rewarded for stringing this litigation along for two years, unreasonably burdening both Newegg and the courts.

As further support that this case "stands out from others" under *Octane Fitness*, it is helpful to consider non-patent cases as well. 134 S. Ct. at 1756. Courts in other contexts have prohibited the bringing of claims without regard to the merits that are filed to perpetuate a sham or other improper purpose. *See USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994) (explaining that "[t]he filing of a whole series of lawsuits and other legal actions without regard to the merits … [is not immunized under the *Noerr-Pennington* doctrine when] the legal filings [were] made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment"); *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 101 (2d Cir. 2000) (same, emphasizing "it is immaterial that some of the claims might, 'as a matter of chance,' have merit") (quoting *USS-POSCO*, 31 F.3d at 811). Courts have also recognized that it is fundamentally unfair for a plaintiff to force a defendant to endure the burden and expense of litigation, see that no settlement payments are forthcoming, and just walk away. *Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546, at *12 (W.D. Wis. Jan. 21, 2009) ("Plaintiff cannot expect to subject

defendant Rose to a year of litigation and walk away with no consequences."); *compare Monolithic Power Sys.*, 726 F.3d at 1367; *cf. Colombrito v. Kelly*, 764 F.2d 122, 134-35 (2d Cir. 1985) (awarding fees would be appropriate "if a litigant had made a practice of repeatedly bringing potentially meritorious claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party and the judicial system").

Where the cost of defense greatly exceeds the cost of settlement, as it does here, plaintiffs can improperly use the leverage of pending litigation to coerce defendants into settling non-meritorious claims. *See, e.g., Ingenuity 13, LLC v. Doe*, No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013). In *Ingenuity 13*, copyright plaintiffs were found to have acted in bad faith and sanctioned for fees in circumstances largely identical to those in this case. First, the plaintiffs engaged in a "nationwide strategy" to file lawsuits against many defendants. *Id.* at *6-7. Due to "the high cost of litigation," "[m]ost defendants settled …, resulting in proceeds of millions of dollars due to the numerosity of defendants." *Id.* "For defendants that refused to settle, the Principals engaged in vexatious litigation designed to coerce settlement. These lawsuits were filed using boilerplate complaints based on a modicum of evidence, calculated to maximize settlement profits by minimizing costs and effort." *Id.* at *7. Finally, like MacroSolve, in *Ingenuity 13* "[t]he Principals have shown little desire to proceed in

these lawsuits when faced with a determined defendant.  Instead of litigating, they dismiss the case." *Id.*

Section 285 is supposed to be remedial—to correct for unfairness and injustice. *See Octane Fitness*, 134 S. Ct. at 1753, 1756 n.6; *see also Kilopass*, 738 F.3d at 1312-13.  The obvious assumption and requirement of § 285 is that patent litigation will be brought and conducted in good faith, and that a case is "exceptional" when it sufficiently deviates from this expectation.  *Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010) ("[T]here is a presumption that an assertion of infringement of a duly granted patent is made in good faith.").

Bad-faith behavior like MacroSolve's is exceptional and warrants shifting of attorneys' fees.  Further, justice requires that Newegg be reimbursed for the considerable expense of retaining a rebuttal expert witness because MacroSolve allowed its baseless case to go through expert discovery.  *See MarcTec*, 664 F.3d at 921-22 (affirming expert fees award because "Cordis was forced to incur expert witness expenses to rebut MarcTec's unreliable and irrelevant expert testimony," such that "MarcTec's vexatious conduct and bad faith increased  the cost of litigation in ways that are not compensated under § 285").  Indeed, using the court system to further MacroSolve's extortive business practices is exactly the kind of egregious bad faith that warrants shifting of expert fees.  *Id.* at 921; *Amsted Indus.*

*v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994) (explaining that "abuse of the judicial process" justifies shifting expert fees).

> 3.   *Shifting Fees Against Nuisance Litigants Like MacroSolve Promotes Sound Policy and Improves the Patent System*

Patent litigation is supposed to resolve legitimate disputes surrounding bona fide infringement allegations, not facilitate nuisance-value patent monetization campaigns. *See Eon-Net,* 653 F.3d at 1328 ("[T]he appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith."). This Court should take this opportunity to clarify that litigation brought for the purposes of extorting nuisance-value settlements, regardless of the merits, is exceptional and will not be tolerated or immunized from fee-shifting simply because it is widespread or because the cases are dismissed early. And to the extent a nuisance litigation campaign crosses into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

Defendants like Newegg play a critical role in the patent system. Such defendants insist that plaintiffs justify their positions and, when the plaintiffs cannot or will not do so, will vindicate their defenses in court. If not for defendants like Newegg, abusive nuisance litigants would never be exposed because every case would settle (or be unilaterally dismissed by the plaintiffs) and conceal the misconduct.

*Octane Fitness* emphasized that Section 285 should serve as a meaningful deterrent to patent abuses, and reflected a clear directive that fee shifting was supposed to be made easier to achieve, not harder. *See, e.g.,* 134 S. Ct. at 1756 (characterizing *Brooks Furniture* as "inflexible"); *id.* at 1756-57 (misconduct to justify fee shifting need not be independently sanctionable); *id.* at 1758 (burden of proof is merely a preponderance of the evidence). Indeed, this Court recently recognized that "[t]his change in the law lowers considerably the standard for awarding fees." *Oplus,* 782 F.3d at 1374.

If the message in *Octane Fitness* was not clear enough that baseless litigation must be actively discouraged via § 285, the Supreme Court in *Commil* squarely addressed the fact that companies like MacroSolve "use patents as a sword to go after defendants for money, even when their claims are frivolous." 2015 U.S. LEXIS 3406, at *22. The Court emphasized that § 285 is a "safeguard" against such abuses, and "stress[ed] that district courts have the authority and *responsibility* to ensure frivolous cases are dissuaded" via § 285 and other available sanctions. *Id.* at *23 (emphasis added).[5]

This Court has the power and responsibility to police the district courts when they abuse their discretion. The Supreme Court undoubtedly intended for this

---

[5] The dissenting Justices sharply questioned whether any rule of law that "increases the *in terrorem* power of patent trolls, is preferable" as a matter of public policy. *Id.* at * 27.

Court to ensure that § 285 is administered in a fair and just manner to discourage litigation abuses. But *Octane Fitness* is rendered meaningless if district courts— even under an abuse of discretion standard on appellate review—do not apply the "considerably" lower standard that *Octane Fitness* was intended to provide. It is important for this Court to provide clear guidance on how *Octane Fitness* should be properly applied to accomplish what the Supreme Court intended—a lower, more equitable standard to rectify the injustices flowing from patent cases that "stand[] out from others," as exists here.

## II.    AT A MINIMUM, THIS CASE MUST BE REMANDED BECAUSE THE DISTRICT COURT DID NOT CONSIDER THE TOTALITY OF THE CIRCUMSTANCES

The Supreme Court in *Octane Fitness* explained that, under 35 U.S.C. § 285, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  134 S. Ct. at 1756.  In applying this standard, the Court held that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, *considering the totality of the circumstances*."  *Id.* (emphasis added). Consideration of the totality of the circumstances in every case is required to restore the proper "holistic, equitable approach" to § 285.  *Id.* at 1754.    Here, the district court did not consider the totality of the circumstances.

As discussed above, in resolving Newegg's motion the district court either outright ignored or barely mentioned at least MacroSolve's inability to:

(1) show that the accused "questionnaire" included the claimed "series of questions";

(2) adduce any evidence to support its "testing" theory of direct infringement;

(3) cite any legal or evidentiary support for its "concert of action" theory of direct infringement;

(4) identify a single instance of direct infringement or to prove that direct infringement necessarily occurred;

(5) show that Newegg instructed its users to perform the claimed method; and

(6) identify any countervailing evidence that this lawsuit was brought and prosecuted in good faith, and not merely to obtain nuisance-value settlement fees.

The district court's analysis totaled three double-spaced pages, half of which merely summarized the parties' contentions without discussing any underlying evidence. A0009-12. If not completely ignored, these issues were handled in a cursory manner or they were side-stepped via the district court's clearly erroneous conclusions that Newegg had taken shifting, inconsistent claim construction positions. Either way, avoiding meaningful analysis of the majority of the circumstances presented to the court is an abuse of discretion when the law requires consideration of the "totality of the circumstances." *Octane Fitness* even expressly states that one the circumstances that must always be considered is "the

substantive strength of a party's litigating position (considering both the governing law and the facts of the case)," and the district court did not even go that far.  134 S. Ct. at 1756.

Instead, the district court proclaimed that it was excused from this analysis because the case was "dismissed before trial," and applied an entirely different standard for exceptionality, stating that "the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits."  A0011.  This standard is wrong and directly conflicts with *Octane Fitness*.

First, there is no basis to create a special standard for cases "dismissed before trial."  *Octane Fitness* emphasized the importance of flexibility, stating that "[t]here is no precise rule or formula for making these determinations."  134 S. Ct. at 1756.  The exceptionality determination cannot hinge on the mere timing of a dismissal.  *See id.*; *Kilopass*, 738 F.3d at 1317 ("[T]rial courts retain broad discretion to make findings of exceptionality under § 285 *in a wide variety of circumstances*.") (emphasis added).

Second, "reasonably clear" proof of "frivolity" is not required.  *Octane Fitness* rejected the notion that objective baselessness must be proven to show exceptionality.  *Octane Fitness*, 134 S. Ct. at 1757.  Rather, "a case presenting *either* subjective bad faith *or* exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award."  *Id.* (emphasis added).

This is why the Supreme Court held that district courts must examine "the substantive strength of a party's litigating position" when a fee motion challenges the merits. *Id.* at 1756. Further, Newegg was not required to prove its case with clear and convincing evidence, as the district court implied by searching for "reasonably clear" proof. The post-*Octane Fitness* standard is a preponderance of the evidence. *Id.* at 1758.

Third, even if cases dismissed before trial were appropriately treated with a special analytical framework, it cannot be correct to insist that "evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits." Although it is not clear what a "mini-trial on the merits" would entail in the district court's view, it is impossible to evaluate "the substantive strength of a party's litigating position" without examining the merits in a meaningful way. The district court, with essentially no analysis of Newegg's merit-based arguments, found that Newegg failed to meet its burden, primarily because of the district court's misdirected and mistaken analysis about Newegg's claim construction arguments. A0009-12. Although "[a] request for attorney's fees should not result in a second major litigation," *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001), *Octane Fitness* requires a much more searching analysis than what the district court did. At a minimum, the

district court must assess the litigation positions on the merits issues in the case to arrive at some measure of the strength of those positions.

Fourth, the district court's test does not even permit consideration of the merits-related issues alongside evidence of bad faith and litigation misconduct to correctly weigh the totality of the circumstances. Rather, the court treated the merits issues in a vacuum; failure to meet the district court's "reasonably clear" threshold dooms a fee motion regardless of any other considerations: "*[f]or a case dismissed before trial to be designated exceptional*, evidence of the frivolity of the claims must be reasonably clear …." A0011 (emphasis added).

Overall, the district court's dearth of analysis flies in the face of *Octane Fitness* and constitutes an abuse of discretion that requires reversal or, at a minimum, a remand for consideration of Newegg's motion under the proper legal standard. *Highmark*, 134 S. Ct. at 1748 n.2; *Kilopass*, 738 F.3d at 1317-18. To the extent this court decides to remand, it should do so with appropriate and clear guidance to correct the numerous clear errors of fact and law made by the district court.

## <u>CONCLUSION</u>

The district court's judgment should be reversed and the case should be remanded to determine the amount of attorneys' fees, expert fees, and other non-taxable expenses owed to Newegg. Alternatively, at a minimum, the judgment

must be vacated and the case remanded for reconsideration under the correct exceptionality standard.

Respectfully submitted,

Dated:  June 26, 2015

/s/ *Daniel H. Brean*
Kent E. Baldauf, Jr.
Daniel H. Brean
Bryan P. Clark
Christian D. Ehret
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd.
Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 471-8815

Mark. A. Lemley
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666

Richard G. Frenkel
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 463-3080

*Counsel for Appellant Newegg Inc.*

## **ADDENDUM**

1.    April 6, 2015 Order Denying Newegg's Motion for Reconsideration
      (A0001 – A0006)

2.    October 16, 2014 Order Denying Newegg's Motion for Attorneys'
      Fees (A0007 – A0012)

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **MACROSOLVE, INC.,** | § § § | |
| **Plaintiff,** | § § | **Case No. 6:11-CV-287-MHS-KNM** |
| **v.** | § § | **[Consolidated Lead Case]** |
| **ANTENNA SOFTWARE, INC., et al.,** | § § § | |
| **Defendants.** | § § § | |

| | | |
|---|---|---|
| **MACROSOLVE, INC.,** | § § | |
| **Plaintiff,** | § § | **Case No. 6:11-CV-287-MHS-KNM** |
| **v.** | § § § | |
| **NEWEGG, INC.,** | § § § | |
| **Defendant.** | § § § | |

### ORDER

Before the Court is Defendant Newegg, Inc.'s ("Newegg") Motion for Reconsideration of the Court's Order on Newegg's Fee Motion (Doc. No. 575) ("Motion for Reconsideration").  Having considered the Motion and related briefing and for the reasons stated below, the Motion is **DENIED**.

### BACKGROUND

On January 30, 2012, MacroSolve, Inc. ("MacroSolve") brought suit against Newegg for infringement of U.S. Patent No. 7,822,816 (the '816 patent), entitled "System and Method

for Data Management."[1]  On September 26, 2013, the parties presented arguments on various

claim terms at a *Markman* hearing, and the Court issued an order construing those terms on

January 21, 2014.  Doc. No. 493.  A hearing on dispositive motions was also set for March 13,

2014.  Doc. No. 533.  Prior to the hearing, on March 7, 2014, the USPTO issued a final office

action in an *ex parte* reexamination proceeding, rejecting all claims of the '816 Patent.  Doc.

No. 559-9.  Several days later on March 12, 2014, Macrosolve filed a motion to voluntarily

dismiss its claims against Newegg, which was granted.[2]  Doc. Nos. 552 and 554.  Newegg

subsequently filed on March 27, 2014, a Motion for an Award of Attorneys' Fees, Experts'

Fees and Non-Taxable Expenses (Doc. No. 558) ("Motion for Attorneys' Fees").  On October

16, 2014, the Court issued an Order denying Newegg's Motion for Attorneys' Fees (Doc. No.

573) ("Order").  Newegg filed its Motion for Reconsideration of the Court's Order on October

30, 2015 (Doc. No. 575).

## LEGAL STANDARD

Newegg seeks relief pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. § 636(b)(1)(A).

These statutes state that the Court may reconsider a Magistrate Judge's order if it is clearly

erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *see also*

*Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995).  The Court applies a "clearly erroneous"

standard to the Magistrate Judge's factual conclusions, a "contrary to law" standard to legal

conclusions, and an "abuse of discretion" standard to the "numerous instances in which

---

[1] Plaintiff filed multiple related actions against other defendants, which were consolidated for pretrial issues
other than venue on September 28, 2012. Dkt. No. 259.  One defendant in a related action filed a request for *ex
parte* reexamination of the '816 patent in the United States Patent and Trademark Office ("USPTO") on April 3,
2013, which the USPTO granted.  Doc. No. 393.  While the *ex parte* reexamination was pending, the above-titled
action proceeded as scheduled.

[2] The same day the parties completed briefing on the Motion for Attorneys' Fees, the Supreme Court decided
*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1753 (2014), which addressed whether a
case is "exceptional" for purposes of awarding attorneys' fees pursuant to § 285.  After *Octane Fitness* was
decided, both parties filed separate notices of supplemental authority.  Doc. No. 568; Doc. No. 571.

A0002

magistrate judges exercise discretion in resolving nondispositive matters." *ColorQuick, L.L.C. v. Vistaprint Ltd.*, No. 6:09-CV-323, 2010 WL 5136050, at *3 (E.D. Tex. July 22, 2010) (citing *Lahr v. Fulbright & Jaworski, LLP*, 164 F.R.D. 204, 208 (N.D.Tex.1996) ("[T]he abuse of discretion standard governs review of that vast area of . . . choice that remains to the [Magistrate Judge] who has properly applied the law to fact findings that are not clearly erroneous.") (citation omitted). A finding is "clearly erroneous" if, although there is evidence to support it, the reviewing court on the entire evidence is "left with the definite and firm conviction that a mistake has been committed." *United States v. Stevens*, 487 F.3d 232, 240 (5th Cir. 2007) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## APPLICABLE LAW

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Prior to the Supreme Court's recent decision in *Octane Fitness*, Federal Circuit precedent required that a "prevailing party" produce clear and convincing evidence that the opposing party's claims were objectively baseless and brought with subjective bad faith to declare a case exceptional. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381–82 (Fed Cir. 2005). Rejecting both the clear and convincing evidence standard and the two-part test, the Supreme Court held that an exceptional case under § 285 is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (concerning both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756. District courts "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 1757; *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014) ("[T]he determination

**A0003**

whether a case is 'exceptional' under § 285 is a matter of discretion.");[3] *see also Calypso Wireless, Inc. v. T-Mobile USA Inc.*, No. 2:08-CV-441, 2015 WL 1022745, at *1 (E.D. Tex. Mar. 5, 2015) ("If the case is shown to be exceptional, the movant must then show that an award of attorney fees is justified.").  As the Supreme Court noted, "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Octane Fitness*, 134 S. Ct. at 1757.

## DISCUSSION

In its Motion for Reconsideration, Newegg alleges that the Court committed a clear error of law by not giving "due consideration to the totality of the circumstances."  Doc. No. 575 at 3 (citing *Octane Fitness* at 134 S. Ct. at 1754).  Specifically, Newegg claims that the Court did not "analyze the many facts and circumstances presented by Newegg to show bad faith, including the amount of MacroSolve's settlements vis-á-vis the damage claim against Newegg, the suspect timing of the Newegg dismissal, and the lack of any apparent pre-suit investigation."  Doc. No. 575 at 4.

The Order, however, contains explicit analysis of such facts and circumstances. Regarding the settlements amounts, the Court noted:  "[t]hat Macrosolve asserted the '816 patent against a wide variety of defendants and settled many of those cases for significantly less than litigation costs does not alone show bad faith."  Doc. No. 573 at 5.  As to timing of the dismissal, the Court explained that "the PTO's final office action that rejected all claims of the '816 patent just days before provides a reasonable explanation for the timing of the dismissal."  *Id.*  With respect to the alleged lack of a pre-suit investigation—which relates to the merits of the infringement allegations—the Court noted that:  "Newegg has not shown that

---

[3] The Supreme Court has further explained that the "question is multifarious and novel, not susceptible to useful generalization of the sort that de novo review provides, and likely to profit from the experience that an abuse-of-discretion rule will permit to develop." *Id.* at 1749–50.

A0004

Macrosolve's infringement theories were baseless or frivolous.  Its own shifting claim construction positions refute such arguments." *Id.*[4]

Newegg further alleges that the Court committed clear error by not finding that Macrosolve's infringement position was so weak as to justify an award of attorneys' fees. Doc. No. 575 at 4.  A primary ground of Newegg's argument is that it could not perform all the steps of the asserted method claim, "either itself or through another acting under its direction or control."  *Id.* at 5.   Nevertheless, the Court noted that Newegg's claim construction positions are inconsistent with such arguments.  Similarly, in its evaluation of the merits of Macrosolve's claims, the Court considered that it "adopted portions of Macrosolve's proposed claim construction on disputed terms and rejected most of Newegg's attempts to narrow claims."  Doc. No. 573 at 5.[5]  In sum, the Court did not err in its conclusion that: "[c]onsidering the totality of the circumstances, this is not an exceptional case."  Doc. No. 573 at 6.

## CONCLUSION

Having reviewed the Opinion of the United States Magistrate Judge and the parties' submissions, the Court is of the opinion that the Magistrate Judge's findings are neither clearly erroneous nor contrary to law, nor did the Magistrate Judge abuse her discretion.  *See* Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  Therefore the Court hereby adopts the

---

[4] Although the Court addressed Newegg's own arguments that MacroSolve's case was "frivolous" and "objectively baseless" using similar language, the Court applied the correct standard under *Octane Fitness*, noting:  "[e]ven under the new, lower standard for an exceptional case designation, Newegg provides little evidence that this case 'stands out from others with respect to the substantive strength of [MacroSolve's] litigating position' or that it litigated the case in an unreasonable manner.' "  Doc. No. 573 at 4–5 (quoting *Octane Fitness*, 134 S.Ct. at 1756).

[5] Newegg's dismissal prior to any decision on its pending motions for summary judgment, and prior to those motions even being heard, further justifies the Court's reliance on judgments made during claim construction to evaluate merits.

A0005

Opinion of the Magistrate Judge as the opinion of this Court.  All objections are overruled and

Newegg's Motion to Reconsider (Doc. No. 575) is **DENIED**.

     **It is SO ORDERED.**

     **SIGNED this 6th day of April, 2015.**

_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **MACROSOLVE, INC.,** | § | |
| | § | |
| | § | **Case No. 6:11-CV-287-MHS-KNM** |
| **Plaintiff,** | § | |
| | § | **[Consolidated Lead Case]** |
| **v.** | § | |
| | § | |
| **ANTENNA SOFTWARE, INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | | |
| | § | |
| **MACROSOLVE, INC.,** | § | |
| | § | **Case No. 6:12-CV-46-MHS-KNM** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **NEWEGG, INC.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

<u>**ORDER**</u>

Before the Court is Defendant Newegg, Inc.'s ("Newegg") Motion for Attorneys' Fees (Doc. No. 558).  Having considered the Motion and related briefing and for the reasons stated below, the Court hereby **DENIES** the Motion.

**BACKGROUND**

Macrosolve, Inc., ("Macrosolve") owns U.S. Patent No. 7,822,816 (the '816 patent).  The invention taught by the '816 patent relates to gathering data on a handheld computing device and transmitting it to another computer through a loosely connected network.  In January 2012, Macrosolve filed this action against Newegg alleging infringement of the '816 patent.  In March

**A0007**

2014, Macrosolve filed a motion to voluntarily dismiss its claims against Newegg with prejudice under Federal Rule of Civil Procedure 41(a)(2).  Doc. No. 552.  The Court Granted Newegg's Motion to Dismiss.  Doc. No. 554.  Newegg now seeks attorneys' fees under 35 U.S.C. § 285, and experts' fees and non-taxable expenses under the Court's inherent power.  On the same day the parties completed briefing on this motion, the Supreme Court decided *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1753 (2014), which rejected the prior Federal Circuit legal test for determining whether a case is exceptional under § 285.  Although neither party requested leave to file additional briefing, both parties filed separate notices of supplemental authority after *Octane Fitness* and other relevant cases were decided.  Doc. No. 568; Doc. No. 571.

## APPLICABLE LAW

### *Exceptional Case Under 35 U.S.C. § 285*

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  Prior to the Supreme Court's recent decision in *Octane Fitness*, Federal Circuit precedent required the prevailing party to produce clear and convincing evidence that the opposing party's claims were objectively baseless and brought with subjective bad faith to declare a case exceptional.  *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381–82 (Fed Cir. 2005).  Rejecting both the clear and convincing evidence standard and the two-part test, the Supreme Court held that an exceptional case under § 285 is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (concerning both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness*, 134 S. Ct. at 1756.  Further, district courts "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion,

2

**A0008**

considering the totality of the circumstances." *Id.* at 1757.  As the Supreme Court noted, "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.*

### *The Court's Inherent Power to Impose Sanctions and Award Expert Fees*

In addition to § 285, the courts retain an inherent power to impose sanctions for "bad faith conduct in litigation." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001); *see also iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1380 (Fed. Cir. 2011); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008).  A district court has inherent authority "to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012) (quoting *Takeda Chem.*, 549 F.3d at 1391 (Fed. Cir. 2008)).  The threshold to invoke the inherent power to sanction is high and is to be used only when a court finds that "fraud has been practiced upon it, or that the very temple of justice has been defiled." *Id.*  (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (internal citations omitted).

### ANALYSIS

Newegg maintains it should be awarded attorneys' fees because Macrosolve engaged in vexatious litigation and brought objectively baseless claims against Newegg in bad faith.  Doc. No. 558 at 3, 9–11.  It asserts that Macrosolve employed abusive litigation strategy and filed this action "for the purpose of extorting a nuisance value settlement" by filing numerous lawsuits against a variety of defendants and settling early for much less than the cost of litigation.  *Id.* at 2, 12.  Further, Newegg argues that the timing of Macrosolve's dismissal—just before the summary judgment hearing and one day before dismissing the rest of its cases—confirms that Macrosolve's litigation scheme was improper.  *Id.* at 13–14.  Additionally, Newegg contends

A0009

that Macrosolve had no reasonable basis to allege direct infringement of the '816 patent because the method claims require steps by the user, not Newegg. *Id.* at 9. Newegg disputes that Macrosolve's inducement argument had any reasonable basis because Newegg would not desire and has not encouraged users to perform the "terminating" and "establishing" network connection steps required for infringement. *Id.* at 10.

Macrosolve responds that its own limited financial resources forced it to settle against other defendants. Doc. No. 559 at 12. Macrosolve points out that a few days before it dismissed its case against Newegg, the Patent Office issued a final office action that rejected all the claims of the '816 patent. *Id.* at 11. Knowing that the asserted patent would soon be cancelled because of its inability to finance reexamination, Macrosolve dismissed this case and all other pending cases asserting the '816 patent. *Id.* at 11–12. Further, Macrosolve asserts that Newegg previously abandoned the argument it makes now—that a user must perform steps of the asserted claims—and instead conceded during claim construction that those steps can be performed automatically based on network conditions. *Id.* at 2–3. Additionally, Macrosolve contends that both Newegg's testing of its own mobile applications and Newegg's joint infringement through acting in concert with its customers, lend reasonable support to its direct infringement theory. *Id.* at 4–5 (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (*en banc*)). Finally, Macrosolve argues that Newegg's mobile app is specifically designed to function in an infringing manner, and its related indirect infringement theory alone makes this lawsuit reasonable. *Id.* at 5.

Even under the new, lower standard for an exceptional case designation, Newegg provides little evidence that this case "stands out from others with respect to the substantive strength of [Macrosolve's] litigating position" or that it litigated the case in an unreasonable

A0010

manner.  *Octane Fitness*, 134 S. Ct. at 1756.  Newegg's briefs accuse Macrosolve of abusive

litigation and highlight reasons why its infringement positions may have been wrong, but they do

not support declaring this is an exceptional case.  That Macrosolve asserted the '816 patent

against a wide variety of defendants and settled many of those cases for significantly less than

litigation costs does not alone show bad faith.  Additionally, Newegg emphasizes the timing of

Macrosolve's dismissal of the case as evidence of bad faith.  However, the PTO's final office

action that rejected all claims of the '816 patent just days before provides a reasonable

explanation for the timing of the dismissal.

     Further, "[f]or a case dismissed before trial to be designated exceptional, evidence of the

frivolity of the claims must be reasonably clear without requiring a "mini-trial" on the merits for

attorneys' fees purposes."  *SFA Systems v. 1-800-Flowers.com, Inc.*, No. 6:09-CV-340, at 4–5

(E.D. Tex. filed July 8, 2014).  Newegg has not shown that Macrosolve's infringement theories

were baseless or frivolous.  Its own shifting claim construction positions refute such arguments.

Newegg initially asserted that, under the '816 patent, a user must cause the network connection

to become unavailable, but abandoned that position in its responsive claim construction brief.

Doc. No. 416 at 4; Doc. No. 438 at 27.  Now, Newegg again contends that steps must be taken

by the user, out of its control, to infringe the patent.  Its assertion that it "was simply responding

to infringement theories Macrosolve advanced," does not explain Newegg's inconsistent

positions or show that Macrosolve's theories were frivolous.  *See* Doc. No. 563 at 1.  Moreover,

the Court adopted portions of Macrosolve's proposed claim construction on disputed terms and

rejected most of Newegg's attempts to narrow claims through further construction.  *See* Doc. No.

493.  This outcome further undercuts the argument that Macrosolve advanced meritless claims.

Finally, Newegg's mere assertion that it would not desire network connections to terminate while

A0011

its mobile application is in use does not show that Macrosolve's indirect infringement theory was meritless.

Considering the totality of the circumstances, this is not an exceptional case. It does not stand out from others with respect to the strength of Macrosolve's litigation position or the manner in which it litigated the case.  Accordingly, Newegg is not entitled to attorneys' fees under 35 U.S.C. § 285

Newegg's argument that it should be reimbursed for experts' fees and non-taxable expenses under the Court's inherent power fails for the same reasons.  "A case must be sufficiently beyond exceptional within the meaning of § 285 to justify . . . a sanction under the court's inherent power."  *SFA Systems*, No. 6:09-CV-340, at 5 (quoting *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 966 (Fed. Cir. 2010)) (internal quotations omitted).  Because Newegg failed to show this case is exceptional under the new, lower standard—much less the more stringent exceptional test of *Brooks Furniture*—there is no justification to invoke the Court's inherent power to impose a sanction of experts' fees and non-taxable expenses here.

Having failed to demonstrate that this is an exceptional case under 35 U.S.C. § 285 or that sanctions are warranted through the Court's inherent powers, Newegg's Motion is **DENIED**.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Newegg's Motion for an Award of Attorneys' Fees, Expert Fees, and Non-Taxable Expenses (Doc. No. 558).

So ORDERED and SIGNED this 16th day of October, 2014.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

A0012

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on June 26, 2015, the foregoing Brief of Defendant-Appellant was served on counsel for Plaintiff-Appellee MacroSolve, Inc. via the Court's ECF system and via electronic mail upon the following:

Matthew Antonelli
Califf T. Cooper
ANTONELLI, HARRINGTON & THOMPSON, LLP
4306 Yoakum Boulevard
Houston, TX 7706
Telephone: (713) 581-3020
matt@ahtlawfirm.com
califf@ahtlawfirm.com


/s/ *Daniel H. Brean*
Daniel H. Brean
*Counsel for Newegg Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the Conclusion on page 64, including headings, footnotes, and quotations, is presented in Times New Roman 14-point font and contains 13,996 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Daniel H. Brean
Daniel H. Brean
*Counsel for Newegg Inc.*